Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
(212) 756-2000 (telephone)
(212) 593-5955 (facsimile)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

J. ARON & COMPANY, on its own
Behalf and as Administrative Agent for the
Co-Lenders,

                  Plaintiff,

        - against -

OSYKA PERMIAN, LLC, OSYKA
CORPORATION, and MICHAEL F.
HARNESS,

              Defendants.

-------------------------------------------------------X

**JUDGE BAER**

**08 CV 1866**

Case No.:

**COMPLAINT**

## PRELIMINARY STATEMENT

1.     This is an action for breach of contract, tortious interference with contract, conversion, aiding and abetting conversion and fraud against Defendants Osyka Corporation ("Osyka"), its wholly-owned subsidiary Osyka Permian, LLC ("Permian"), and Michael F. Harness, who effectively controls both entities (collectively, "Defendants"). This action arises from Defendants' continuing failure to pay loan obligations under a Credit and Guaranty Agreement dated as of May 10, 2006 (the "Credit Agreement"), and their repeated and systematic misuse and misappropriation of loan funds, conversion of loan collateral, and fraudulent efforts to conceal their illicit activities.

2.     The corporate defendants are in default under the Credit Agreement, which required payment in full of all loaned amounts, arrears, interest and fees by June 8, 2007. Compounding that default, Harness and Permian have (a) purported to assign "free and clear," to an Osyka shareholder and friend, interests in valuable mineral leaseholds and related assets that,

at the time of such assignments were and today are, subject to security and/or mortgage interests held by Plaintiff J. Aron & Company ("J. Aron"), and (b) then concealed their conversion through misleading reports designed to create the illusion that the wrongfully assigned assets were still owned by Permian. Moreover, Defendants have diverted millions of dollars of loan proceeds and/or cash collateral, in violation of the agreed-upon spending constraints of the Credit Agreement, to pursue unauthorized expenditures and systematic conversion of cash collateral.

3.       As a result of Defendants' conduct, J. Aron and its co-lender (together, Lenders"), on whose behalf J. Aron brings this suit, have been damaged in excess of $59 million, to which they are contractually and legally entitled.

## THE PARTIES

4.       Plaintiff J. Aron is a New York general partnership with its principal place of business at 85 Broad Street, New York, New York 10004. None of J. Aron's partners is a citizen of Texas. J. Aron was the Lead Arranger, Syndication Agent, Administrative Agent and a 50% Lender under the Credit Agreement. As Administrative Agent, J. Aron is authorized to bring this action on behalf of Lenders.

5.       Defendant Permian is a Texas limited liability company having its principal place of business at 15995 N. Barkers Landing, Suite 300, Houston, Texas 77079.

6.       Defendant Osyka is a Nevada corporation having its principal place of business at 15995 N. Barkers Landing, Suite 300, Houston, Texas 77079. Osyka is a Guarantor under the Credit Agreement, and is the sole member of Permian.

7.       Defendant Harness, upon information and belief, resides at 13526 Schumann Trail, Sugar Land, TX 77478-3495. Harness is Chairman of the Board, President, CEO and majority equity interest holder of Osyka, and President of Permian. As set forth in

detail below, Harness was the principal actor in, and caused to occur, all of the acts complained of herein, and Harness executed all agreements, documents and instruments relevant to this action on behalf of Osyka and Permian.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

9.      This Court has personal jurisdiction over Defendants pursuant to CPLR § 302(a)(3) and the express consent of Osyka and Permian pursuant to Section 10.15 of the Credit Agreement.

10.     Venue is appropriate in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(a)(2) and Section 10.15 of the Credit Agreement.

## FACTUAL BACKGROUND

### The Credit Agreement

11.     Over the past fifteen years, Harness has acquired through Osyka and Permian working interests in oil and gas properties in Mississippi, Texas and Louisiana. On February 1, 2005, Harness acquired through Permian a 75% working interest in numerous oil and gas leases in the Reedy Creek Field in Jones County, Mississippi ("Reedy Creek") for a purchase price of approximately $37.5 million.

12.     In order to finance those acquisitions and secure working capital, Harness caused Osyka and Permian to enter into financing arrangements with various sources, including Amegy Bank National Association ("Amegy"), which financed the Reedy Creek acquisition. By Fall 2005, Permian had defaulted on its obligations under its financing arrangement with Amegy, and Harness began seeking out new financing for his oil and gas ventures.

13.    Osyka and Permian ultimately entered into the Credit Agreement with Lenders, by which Lenders initially agreed to loan Permian $50.5 million. The proceeds of the initial funding were used to pay off Amegy and certain trade vendors, which left approximately $7.4 million for working capital and other expenses associated with Permian's business. Harness executed the Credit Agreement and related security agreements and mortgage on behalf of both Permian, as obligor, and Osyka, as guarantor.

14.    With respect to Permian, the Credit Agreement unconditionally obligated Permian, among other things, to pay "all amounts owed" in respect of the Loans "in full no later than the Maturity Date" and to make quarterly interest payments. The "Maturity Date" was originally defined in the Credit Agreement as "the earlier of (i) May 9, 2012, and (ii) the date that all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise," but was later amended to be June 8, 2007 following certain events of default, as discussed below. The original interest rate was set at a per annum rate of 13.90%, but increased by 2% upon occurrence of an "Event of Default" (the "Post-Default Rate"), which was to be applied throughout the continuance of the Event of Default. Permian was required to pay in arrears all unpaid interest accrued through the Maturity Date.

15.    Beyond its payment obligations under the Credit Agreement, Permian was obligated thereunder to avoid incurrence of debt and to limit its use of the Loan funds and other cash collateral to certain agreed-upon expenditures. Specific limits applied to general and administrative ("G&A") expenses which, in accordance with the Credit Agreement, Permian agreed not to exceed. In addition, the scope of approved capital expenditures during the term of the Credit Agreement was set forth in an Approved Plan of Development ("APOD"), which was prepared by Permian and approved by Lenders. The APOD constituted a written, binding plan

of development setting out the approved development activities, including timing and the
maximum capital expenditure permitted, and could not be amended without the prior written
consent of Lenders. Permian was prohibited from "mak[ing] capital expenditures or acquisitions
of oil and gas properties" other than those named in the APOD.

16.    With respect to Osyka, the Credit Agreement provided that Osyka would
**"irrevocably and unconditionally guarantee to [J. Aron] for the ratable benefit of the
Beneficiaries the due and punctual payment in full of all Obligations when the same shall
become due, whether at stated maturity, by required prepayment, declaration,
acceleration, demand or otherwise . . . (collectively, the "Guaranteed Obligations)."** Osyka
agreed further that,

> upon the failure of [Permian] to pay any of the Guaranteed
> Obligations when and as the same shall become due, . . .
> Guarantor[] will upon demand pay, or caused to be paid, in
> immediately available funds, to [J. Aron] for the ratable benefit of
> Beneficiaries, an amount equal to the sum of the unpaid principal
> amount of all Guaranteed Obligations then due as aforesaid, all
> accrued and unpaid interest on such Guaranteed Obligations
> (including interest which, but for [Permian's] becoming the subject
> of a case under the Bankruptcy Code, would have accrued on such
> Guaranteed Obligations, whether or not a claim is allowed against
> [Permian] for such interest in the related bankruptcy case) and all
> other Guaranteed Obligations then owed to Beneficiaries as
> aforesaid.

17.    The Credit Agreement specifically provided that Osyka's obligations were
"irrevocable, absolute, independent and unconditional," and were not subject to "any reduction,
limitation, impairment, discharge or termination for any reason (other than payment in full of the
Guaranteed Obligations)." Osyka agreed that its guaranty "is a continuing guaranty and shall
remain in effect until all of the Guaranteed Obligations shall have been paid in full and the
Commitments shall have terminated."

18.     To secure the payment obligations under the Credit Agreement, Osyka

agreed to deliver, and cause Permian to deliver, "deeds of trust, mortgages, chattel mortgages,

security agreements, financing statements and other Security Documents in form and substance

satisfactory to [J. Aron] for the purpose of granting, confirming, perfecting Acceptable Priority

liens or security interests in any real or personal property now owned or hereafter acquired by

any Credit Party." On May 10, 2006, Osyka and Permian entered into a Pledge and Security

Agreement with J. Aron (the "Security Agreement"), and Permian, through Osyka, entered into a

Deed of Trust, Mortgage, Assignment, Security Agreement, Fixture Filing and Financing

Statement, dated May 10, 2006 (the "Mortgage"), pursuant to which various mortgages were

recorded in Jones County, Mississippi and all other counties and states where Permian owned

real property interests, including Texas and Louisiana.

**Defendants Almost Immediately Begin Breaching The Credit Agreement**

19.     Under the direction and control of Harness, Permian began engaging

almost immediately in unauthorized expenditures and misappropriations of cash, leading

ultimately to a default in its payment obligations. For example, in or about September 2006,

Harness, without prior notice to, or the written consent of, Lenders, improperly caused Permian

to enter into and consummate an agreement to acquire interests in the Hiwannee North Field in

Wayne County, Mississippi for approximately $1.2 million, which was in contravention of the

APOD.

20.     Soon thereafter, Harness again without prior notice or Lenders' written

approval improperly caused Permian to use approximately $75,000 of cash collateral to acquire

interests in the El Toro Field in Jackson County, Texas ("El Toro"), which also was not

identified in the APOD.

21.     Beyond these unauthorized capital expenditures, Harness caused Permian to breach the Credit Agreement by making unauthorized use of $215,327 of cash collateral to pay general and administrative expenses in excess of express limits, and to incur unauthorized indebtedness of $288,701 to finance insurance premiums (which included penalty payments because Permian had wrongfully depleted the funds needed to pay those premiums on time).

22.     Ultimately, with its cash drained by the above-described unauthorized expenditures and by the effect of other questionable expenditures, on December 26, 2006, Permian defaulted on its quarterly interest payment, paying only $770,660.19 of the $2,028,134.84 accrued interest due.

## Harness Causes Permian to Convert J. Aron's Mortgaged Reedy Creek Property

23.     As J. Aron only recently learned, Permian, under the direction and control of Harness, diverted not only cash but also interests in mineral leases and related assets that secured obligations under the Credit Agreement.

24.     In the APOD, Lenders had approved the expenditure of approximately $623,000 in expenses by Permian for the drilling of a certain oil well ("Gary Nichols") to a depth of 10,200 feet. Permian had acquired its working interest in the leaseholds on which the Gary Nichols well was later (beginning in the Summer of 2006) drilled through its acquisition of mineral leases in Reedy Creek. However, under the terms of the Purchase and Sale Agreement (the "Venture SPA") with Venture Oil and Gas, Inc. ("Venture") governing the acquisition, Permian was required to enter into a Joint Operating Agreement with Venture (the "JOA"), which designated Venture as "Operator" of Reedy Creek, thereby giving Venture effective control of all oil and gas properties in Reedy Creek and the power to determine whether, when and where additional drilling would be proposed.

25.    The process of proposing the additional drilling was accomplished through an "Authority for Expenditure" ("AFE"), by which Venture would inform the non-operator interest ("Working Interest") holders at Reedy Creek (*i.e.*, Permian) of the proposed date of the new drilling and the expected drilling costs.  Thereafter, the Working Interest holders would have thirty-days to consent to the drilling.  If a Working Interest holder did not affirmatively "consent" within the 30 days, it was considered to have "non-consented," upon which the consenting parties could proceed with drilling at their own cost and risk, subject to recovery of a penalty against the non-consenters' shares of production and proceeds equal to a 500% premium.

26.    Shortly before Venture began drilling the Gary Nichols well to the depth approved in the APOD, and desirous of drilling deeper than the 10,200 feet approved in the APOD, in July 2006, Venture issued an AFE for deeper drilling at the Gary Nichols well. Permian then requested Lenders' approval to go beyond the APOD approved depth at an estimated additional cost of approximately $800,000 to Permian.  Lenders denied the request, as was their contractual right.

27.    Having been denied access to Lenders' cash collateral to fund the deeper drilling of the Gary Nichols well, rather than non-consent the AFE (as Harness had represented to Lenders he had), Harness hatched a surreptitious scheme with his friend and co-shareholder in Osyka, Oswald J. Scott, Jr.  Under this scheme, Harness would cause Permian to (i) first convert more than $800,000 of Lenders' proceeds (to fund Permian's share of the cost of the AFE), and (ii) assign all of its interest in the Gary Nichols leaseholds and related personal property and proceeds thereof, plus a portion of its interests in the El Toro leaseholds and related personal property and proceeds thereof, purportedly "free and clear" to Scott's company BIP Holdings, LLC ("BIP"), notwithstanding the fact that J Aron had a perfected mortgage interest on the Gary

Nichols leaseholds, and valid security interests in various personal property on and used in connection with both the El Toro leaseholds and the Gary Nichols leaseholds, including any receivables and proceeds derived therefrom.

28.    Despite full knowledge of Lenders' valid security interest in certain of the assets relating to the El Toro property, on December 20, 2006, but effective as of September 1, 2006, Permian assigned to BIP a 40% interest in the EL Toro property purportedly "free and clear of any outstanding mortgage, deed of trust, lien or encumbrance created by Assignor, but not otherwise" (the "El Toro Assignment"). Harness executed the assignment on behalf of Permian, and Scott executed the assignment on behalf of BIP. Scott paid Permian $50,000 for the assignment.

29.    The next day, and again despite full knowledge of Lenders' valid and recorded mortgage on the Gary Nichols leasehold, and more than a month after Permian had knowledge that the well had established commercial oil production, on December 21, 2006 (this time effective November 1, 2006), Permian assigned to BIP 100% of its interests in the Gary Nichols leaseholds and related personal property, again purportedly "free and clear of any outstanding mortgage, deed of trust, lien or encumbrance created by Assignor, but not otherwise" (the "Gary Nichols Assignment"). This assignment also was executed by Harness on behalf of Permian, and by Scott, on behalf of BIP. In January 2007, Scott paid Permian $375,000 for the Gary Nichols Assignment and, on information and belief, to date has not paid for any other costs (including drilling and operating) related to the Gary Nichols well incurred and paid improperly by Permian from Lenders' proceeds.

30.    However, as Permian and Harness knew, the assets subject to the Gary Nichols and El Toro Assignments could not be transferred "free and clear." First, under the

Credit Agreement, Permian was not permitted to transfer such assets without the prior written consent of the Lenders. Moreover, with respect to the Gary Nichols Assignment, the assigned leases, including the oil and gas extracted therefrom and the proceeds thereof, were at the time of execution, and still today are, subject to J. Aron's Mortgage, which was duly recorded in Jones County, Mississippi on May 17, 2006. Similarly, with respect to the El Toro Assignment, J. Aron had at the time of execution, and still today has, a valid and enforceable security interest in the personal property and proceeds thereof as a result of the May 10, 2006 Security Agreement.

31.     Venture's records show further that drilling to 12,000 feet on the Gary Nichols well had already been completed by no later than November 1, 2006 – before Harness agreed to assign Gary Nichols to BIP. Harness defrauded Lenders by converting Lenders' cash collateral of approximately $800,000 to pay to Venture Permian's share of the deeper drilling costs and by converting an unknown amount of Lenders' cash collateral subsequent to November 1 to pay Permian's share of the monthly operating expenses and fees related to the well.

32.     The deeper drilling struck commercial quantities of oil. However, the proceeds of that oil, which represented collateral securing the Credit Agreement under the duly recorded Mortgage, have been converted by Harness and Permian and paid to BIP. Upon information and belief, the illicitly converted proceeds from the Gary Nichols well total approximately $800,000 to date, with significant amounts in duly owing proceeds expected over the life of the well.

## Harness' Fraudulent Efforts to Conceal the Gary Nichols and El Toro Assignments

33.     Having made these unauthorized assignments, Harness then took steps to hide them from J. Aron. Recordation of the Gary Nichols Assignment was delayed until June 1, 2007, approximately six months after execution. Upon information and belief, the El Toro Assignment has never been recorded. Moreover, Harness whitewashed the assignments by

10615562.2                                                                                          10

providing specific information to Lenders in the form of daily production reports that, over the several months following the wrongful assignments, intentionally created the false illusion that Permian's ownership was still intact and that there was no interference with J. Aron's rights and interests.

34.     Thus, production reports for February 2007, March 2007 and April 2007 (that Permian was contractually obligated to provide) set forth production numbers for El Toro. The reports also contain some very matter-of-fact notations about the wells. For example, the February 2007 report indicates that "El Toro field shut in due to hole in SW line." The March 2007 report indicates: "NICHOLS #2 SHUT DOWN 8AM. DEEPENING WELL." The July 2007 report indicates that "GARY NICHOLS #2 SHUT DOWN. NOT PUMPING." And, the August 2007 report explains that "Nichols #2 Down 4 hrs, lightning struck panel box."

35.     By including El Toro and Gary Nichols in the notations and production numbers, Defendants were specifically representing to J. Aron that the assigned assets, and the cash proceeds received therefrom, were still owned by Permian, which Defendants knew was not true. Including references to those assets and proceeds, without any indication that Defendants had caused Permian to assign its interests in them to BIP, was designed to and did directly cause J. Aron to refrain from taking any actions that might have uncovered Harness' wrongful conversion of J. Aron's collateral. As a result, J. Aron lost the opportunity to prevent the diversion of the proceeds of the Gary Nichols well to BIP.

36.     Moreover, Harness caused Permian to conceal its payouts to BIP of the proceeds from the Gary Nichols well by identifying them in Permian's financial records as "joint interest billings," without any reference to Gary Nichols, BIP or Scott. By dressing up the transfers as he did, Harness successfully created the impression that these were ordinary course

royalty payments to a legitimate royalty interest holder – not the siphoning off of Lenders' cash collateral.

37.    Finally, in Forbearance Agreements dated as of June 12, 2007 and July 26, 2007, which are discussed further below, Defendants represented that there were no Events of Default other than those identified in those agreements, notwithstanding the fact that Defendants knew then that Permian had transferred its assets in the EL Toro and Gary Nichols Assignments to BIP in violation of the Credit Agreement.

## The First Amendment To The Credit Agreement

38.    Following Permian's December 26, 2006 default on its accrued interest payment, on January 11, 2007, J. Aron sent Permian and Osyka, to Harness' attention, a Notice of Default and Demand for Payment and Cure. Permian and Osyka failed to cure the default, and Lenders subsequently learned of additional Events of Default as well. In light of these defaults, J. Aron, its co-lender, Osyka and Permian entered into a First Amendment to Credit and Guaranty Agreement, dated as of April 4, 2007 (the "Amendment"). As with the Credit Agreement, Harness executed the Amendment on behalf of both Osyka and Permian, and was intimately involved in negotiating the terms of the Amendment.

39.    The Amendment changed the Maturity Date for the Loan to be "the earlier of (i) *June 8, 2007* [as opposed to May 9, 2012], and (ii) the date that all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise." The Amendment also provided for the creation of a "Collateral Account" into which Permian was required to place all existing cash balances of both Osyka and Permian, as well as "all cash revenues and cash receipts of [Osyka and Permian] from any source or activity from and after April 4, 2007 through the Maturity Date." The Amendment conferred upon J. Aron "exclusive dominion and control" over the Collateral Account and all proceeds required to be placed therein. Neither Osyka,

Permian nor Harness were permitted access to the funds in the Collateral Account without the express consent of J. Aron.

40.     Osyka specifically "ratifie[d] and confirm[ed] its obligations under Section 7 of the Credit Agreement and agree[d] that all of its respective obligations and covenants thereunder shall remain unimpaired by the execution and delivery of this Amendment."

### Harness Causes Permian To Convert J. Aron's Cash Collateral

41.     Despite Osyka's and Permian's agreement in the Amendment that all of their cash balances and cash receipts were to be placed in the Collateral Account, within J. Aron's control, Permian, at Harness' direction, proceeded to engage in wholesale conversion of J. Aron's interests.

42.     For example, Permian and Osyka were required to contact purchasers of their oil and gas products and direct them to pay amounts due directly into the Collateral Account ("Letters in Lieu"). However, Harness actually instructed some of the purchasers to do the opposite – *i.e.,* to make payments into *Permian's operating account.*

43.     Moreover, J. Aron has also learned that Harness, allegedly on behalf of Permian, reached an oral understanding with Venture to further divert J. Aron's cash collateral. Under the JOA covering Reedy Creek, Venture received proceeds from the oil sold and was obligated to wire transfer to Permian its share of such proceeds within two business days of its receipt. Thereafter Venture would bill Permian for its monthly share of expenses and fees, which would be due and payable by Permian within 30 days. However, Harness, without notice to or approval of Lenders, orally agreed to permit Venture to take its expenses out first, and then pay Permian (into the Collateral Account) the net proceeds.

44.     Finally, in addition to diverting J. Aron's cash collateral on its way to the
Collateral Account, Harness caused Permian simply to steal the money once it arrived in
Permian's operating account. During a meeting between Lenders and Harness in September
2007, J. Aron learned that approximately $800,000 of the cash collateral had been improperly
directed to and received by Permian in its operating account. During a break in the meeting,
however, J. Aron learned that some of the converted funds still remained in Permian's operating
account, and demanded that Harness cause Permian to return all remaining amounts to the
restricted account. Instead, Harness simply went to another conference room and caused
Permian *to convert more money* by giving wire transfer instructions to divert approximately
$400,000 of the remaining cash collateral to pay, among others, Permian's consultants and
lawyers.

## Defendants Further Default on the Credit Agreement

45.     On June 8, 2007, the Loan fully matured. Permian did not, however, pay
the outstanding Loan principal, or accrued interest, as required under the Credit Agreement.
Accordingly, J. Aron, its co-lender, Permian and Osyka entered into a Forbearance Agreement,
dated as of June 12, 2007 (the "First Forbearance").

46.     In the First Forbearance, Permian "acknowledge[d] and agree[d]" that it
"fail[ed] to pay in full the principal component of the Loans, together with accrued interest on
such principal, on the Maturity Date." Permian further

> acknowledge[d], confirm[ed] and agree[d] that as of the close of
> business on June 11, 2007, (a) [Permian] is indebted to [J. Aron
> and GSUIG] in respect of the Loans in the principal amount of
> $52,847,412.84 and in respect of accrued but unpaid interest
> related thereto in the amount of $1,647,518.10 and (b) interest
> continues to accrue in respect of the Loans at the per diem amount
> of $23,340.94. All such Loans, together with interest accrued and
> accruing thereon, and fees, costs, expenses and other charges now
> or hereafter payable by [Permian] to [J. Aron and GSUIG] under

> the Transaction Documents, are unconditionally owing by
> [Permian] to [J. Aron and GSUIG], *without offset, defense or
> counterclaim of any kind, nature or description whatsoever.*

47.    In addition, Permian acknowledged two other Events of Default. First,

Permian had failed to comply with the requirements of the Amendment that it effect an asset sale

of Permian, on a prescribed time schedule, but in no event later than the Maturity Date. The

express purpose of the asset sale was to secure "cash consideration in an amount sufficient to

repay (and that can be used to repay) all of the obligations on or before the Maturity Date."

Second, Permian acknowledged that it had again exceeded the monthly aggregate G&A expense

limits in the Credit Agreement with respect to the calendar months of January through May

2007.

48.    Thereafter, in light of Permian's and Osyka's continuing failure to repay

the Loan as required, the parties entered into a second Forbearance Agreement, dated as of July

26, 2007 (the "Second Forbearance"). In the Second Forbearance, Permian again acknowledged

its failure to repay the Loan in specifically confirming that:

> As of the close of business on July 25, 2007, (a) [Permian] is
> indebted to [J. Aron and GSUIG] in respect of the Loans in the
> principal amount of $54,034,718.06 and in respect of accrued but
> unpaid interest related thereto in the amount of $692,094.68 and
> (b) interest continues to accrue in respect of the Loans at the per
> diem amount of $23,865.33. All such Loans, together with interest
> accrued and accruing thereon, and fees, costs, expenses and other
> charges now or hereafter payable by [Permian] to [J. Aron and
> GSUIG] under the Transaction Documents, are unconditionally
> owing by [Permian] to [J. Aron and GSUIG], *without offset,
> defense or counterclaim of any kind, nature or description
> whatsoever.*

49.    Permian has not paid any portion of the $54,726,812.74 in principal and

accrued interest it conceded was "unconditionally owing" to Lenders as of July 25, 2007, nor has

it paid any portion of the interest that has been accruing at the Post-Default Rate ever since.

50.     J. Aron has made a Demand for Payment on Osyka under the Guaranty, but to date Osyka has not satisfied its obligations as guarantor.

51.     The total amount due and owing by Permian to J. Aron under the Credit Agreement (as of February 20, 2008) is $59,936,970.95, plus interest that continues to accrue at the Post-Default Rate (the "Credit Agreement Indebtedness") and the costs and expenses (including attorneys' fees and costs of other professional associated with enforcing J. Aron's rights and collecting all amounts due under the Credit Agreement, as amended).

## Harness' Personal Domination and Control

52.     Through his position as Osyka's chairman, president, chief executive officer and owner of in excess of 47% of Osyka's stock, and as the president of Permian, Harness had complete domination and control over every wrongful act and omission discussed herein. Harness had complete knowledge of and was personally involved in every breach of the Credit Agreement and Amendment, as well as each act of conversion and fraud. Harness executed the Credit Agreement on behalf of Permian and/or Osyka, and was directly involved in negotiating the terms of those agreements. He was fully aware of Permian's and Osyka's obligations under the Credit Agreement and Amendment, and it was through his actions that they failed to satisfy those obligations.

53.     Moreover, Harness was the primary actor in every act of conversion and fraud. Harness executed the unauthorized assignments of the Gary Nichols and El Toro assets to his co-shareholder and friend, notwithstanding the fact that he knew J. Aron had mortgage and/or security interests in those assets. Harness also directed the transmission of the daily production reports to J. Aron, having designed them to conceal the unlawful assignments. Finally, Harness directly participated in the conversion of Lenders' cash collateral by (i) wrongfully assenting to Venture's withholding expenses before transferring oil proceeds to the Collateral Account, (ii)

10615562 2                                      16

personally instructing Permian's buyers to make payments to Permian's operating account rather than the Collateral Account; and (iii) personally directing Lenders' cash collateral to be wired to third parties.

## FIRST CAUSE OF ACTION
(Breach of Contract Against Permian)

54.     J. Aron repeats and realleges, as if set forth fully herein, the allegations contained in Paragraphs 1 through 53.

55.     The Credit Agreement, as amended, is a valid and enforceable contract between J. Aron, Lenders, on whose behalf J. Aron brings suit, and Permian.

56.     Permian has breached its obligations owed to J. Aron under the Credit Agreement by, among other things, failing to pay the Loan in full, plus accrued interest, on the Maturity Date.

57     All conditions to the payment of the amount due in the Credit Agreement have been met.

58.     By reason of the foregoing breaches, J. Aron has been damaged in an amount of not less than $59,936,970.95, plus interest that continues to accrue at the Post-Default Rate, fees and costs.

## SECOND CAUSE OF ACTION
(Breach of Contract Against Osyka)

59.     J. Aron repeats and realleges, as if set forth fully herein, the allegations contained in Paragraphs 1 through 58.

60.     The Credit Agreement, as amended, is a valid and enforceable contract between J. Aron, Lenders, on whose behalf J. Aron brings suit, and Osyka, as guarantor of Permian's indebtedness.

61.     Osyka has breached its obligations owed to J. Aron under the Credit Agreement by, among other things, failing to pay the Loan in full, plus accrued interest, on the Maturity Date.

62.     All conditions to the payment of the amount due in the Credit Agreement have been met.

63.     By reason of the foregoing breaches, J. Aron has been damaged in an amount of not less than $59,936,970.95, plus interest that continues to accrue at the Post-Default Rate, fees and costs.

### THIRD CAUSE OF ACTION
(Tortious Interference with Contract Against Harness)

64.     J. Aron repeats and realleges, as if set forth fully herein, the allegations contained in Paragraphs 1 through 63.

65.     The Credit Agreement and related security agreements and mortgages (the "Loan Agreements"), as amended, are a valid and enforceable contract between J. Aron, Lenders, on whose behalf J. Aron brings suit, Permian and Osyka.

66.     Harness had full knowledge of the existence of the Loan Agreements, as well as its terms.

67.     Harness intentionally caused Permian and Osyka to breach their obligations under the Loan Agreements.

68.     As a direct result of Harness' intentional conduct, J. Aron has been damaged in an amount of not less than $59,936,970.95, plus interest that continues to accrue at the Post-Default Rate, fees and costs.

## FOURTH CAUSE OF ACTION
(Conversion Against Permian)

69.    J. Aron repeats and realleges, as if set forth fully herein, the allegations contained in Paragraphs 1 through 68.

70.    J. Aron has possessory rights to the subject property wrongly assigned in the Gary Nichols Assignment, the subject property wrongly assigned in the El Toro Assignment, and all cash funds that were deposited into the Collateral Account, or were required to be deposited into the Collateral Account.

71.    Permian exercised dominion and control of the subject property in the Gary Nichols Assignment, the subject property in the El Toro Assignment, and the cash funds that were deposited into the Collateral Account, or were required to be deposited into the Collateral Account, thus interfering with J. Aron's rights thereto.

72.    Permian acted intentionally and without authority in connection with the Gary Nichols Assignment, the El Toro Assignment and the diversion of J. Aron's cash collateral.

73.    As a result of Permian's conversion, J. Aron has been damaged in an amount of not less than $2 million.

## FIFTH CAUSE OF ACTION
(Aiding and Abetting Conversion Against Harness)

74.    J. Aron repeats and realleges, as if set forth fully herein, the allegations contained in Paragraphs 1 through 73.

75.    Permian engaged in conversions of J. Aron's property rights and/or interests.

76.    Harness was fully aware of Permian's conversions because he was the principal actor directing Permian's conversion.

77. Harness substantially assisted Permian's conversions by taking all of the steps involved in the conversions, including but not limited to executing the agreements effecting the conversions, arranging for such conversions and actively directing that such conversions occur.

78. As a result of Harness' substantial assistance, Permian successfully converted J. Aron's property rights and/or interests.

79. As a result of Harness's aiding and abetting Permian's conversion, J. Aron has been damaged in an amount of not less than $2 million.

## SIXTH CAUSE OF ACTION
(Fraud Against All Defendants)

80. J. Aron repeats and realleges, as if set forth fully herein, the allegations contained in Paragraphs 1 through 79.

81. Defendants, through daily production reports, intentionally concealed from J. Aron the occurrence of the El Toro and Gary Nichols Assignments.

82. J. Aron relied on the fact that the assets subject to the El Toro and Gary Nichols Assignments were identified in the daily production reports to indicate that they were still owned by Permian.

83. At the time Defendants provided the daily production reports to J. Aron, they knew the El Toro and Gary Nichols Assignments had occurred, and that those assignments deprived J. Aron of all or part of its rights under the Security Agreement and Mortgage.

84. As a result of Defendants' fraud, J. Aron was prevented from discovering the wrongful assignments of El Toro and Gary Nichols, which resulted in damages in excess of $1.3 million from those properties, and proceeds thereof, as such amounts were wrongfully

transferred to or used for the benefit of BIP Holdings rather than becoming cash collateral

securing Permian's obligation under the Credit Agreement.

      **WHEREFORE,** J. Aron requests judgment in its favor against Defendants for:

a)    all sums due and owing from under the Credit Agreement, as amended, in an amount of $59,936,970.95, plus interest that continues to accrue at the Post-Default Rate;

b)    costs and expenses, including reasonable attorneys' fees arising from J. Aron's efforts to enforce, or collect payment due pursuant to, the Credit Agreement, or any related agreement thereto;

c)    a sum equal to all proceeds due and owing to J. Aron on property and interests assigned to BIP Holdings;

d)    a sum equal to the cash collateral converted by Permian and Harness;

e)    attorney fees;

f)    any further relief the Court deems just and proper.

Dated: New York, New York
       February 26, 2008

SCHULTE ROTH & ZABEL LLP

By: _____

Howard O. Godnick
Jeffrey S. Sabin
Frank J. LaSalle
919 Third Avenue
New York, New York
(212) 756-2000
howard.godnick@srz.com
jeffrey.sabin@srz.com
frank.lasalle@srz.com

*Attorneys for Plaintiff J. Aron & Company*